J-S25036-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.E.L.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.C., FATHER | : | No. 101 MDA 2020 |

Appeal from the Decree Entered December 16, 2019
In the Court of Common Pleas of Luzerne County
Orphans' Court at No(s):  A-8889

BEFORE:  LAZARUS, J., DUBOW, J., and KING, J.

MEMORANDUM BY KING, J.:                    **FILED JULY 01, 2020**

Appellant, T.C. ("Father"), appeals from the decree entered in the Luzerne County Court of Common Pleas, Orphans' Court, which granted the petition of Children and Youth Services ("CYS") for involuntary termination of Father's parental rights to his minor child, A.E.L.C. ("Child").[1]  We affirm.

The relevant facts and procedural history of this case are as follows. Child was born in May 2018.  At the time of Child's birth, Mother and Child tested positive for cocaine.  CYS became involved, and reached out to Father on three separate occasions to assess his prospects as a placement resource. Father, however, repeatedly denied CYS access to his home.  The court subsequently granted CYS's request for an emergency shelter care order,

---

[1] The court also terminated the parental rights of E.E ("Mother") who is not a party to the current appeal.

adjudicated Child dependent, and placed her in foster care. CYS also developed a family service plan that ordered Father to complete a drug and alcohol evaluation and follow any resulting recommendations; complete a mental health assessment and follow any resulting recommendations; complete a parenting education course; participate in the color call-in system; and maintain safe and stable housing.

Father visited Child for a few months after her placement. In October 2018, Father started a new job in New York and ended his visitation with Child shortly thereafter. Father's last recorded visit with Child occurred on November 2, 2018. Father lived in New York until April 2019. During that time, Father failed to provide CYS with a New York mailing address or updated phone number.

On January 7, 2019, the court found aggravated circumstances existed in Father's case, and relieved CYS of its obligation to make reasonable efforts to reunify Child with Father. Specifically, the court found Father's parental rights to another child had previously been involuntarily terminated.

On February 5, 2019, Father attended his last permanency review hearing. CYS did not have contact with Father again until April 2019, when Father called CYS caseworker, Gabrielle Stelmak, to inquire about his options to participate in the court-ordered mental health evaluation, drug and alcohol evaluation, and parenting course. Although no longer required to assist with Father's reunification efforts, Ms. Stelmak gave Father the contact information

for various service providers.

On May 14, 2019, CYS filed a petition for involuntary termination of Father's parental rights. As of CYS's filing, Father had not completed the court-ordered services. The court conducted termination hearings on August 22, 2019 and September 10, 2019. Ms. Stelmak and Father testified during both hearings. Significantly, Ms. Stelmak described Father's noncompliance with the family service plan and his absence from Child's life. Ms. Stelmak also stated that Child had assimilated with her foster family and would not suffer any detrimental effects should Father's rights be severed. In contrast, Father testified that CYS was uncooperative and impeded his ability to reunify with Child. Furthermore, Father stated that neither his drug and alcohol evaluation nor his mental health evaluation presented additional recommendations that required Father to follow through with treatment.

On December 16, 2019, the court determined that Child had been out of Father's care for at least twelve (12) months, Father had not remedied the conditions which had led to removal, and termination would be in Child's best interests. Consequently, the court terminated Father's parental rights. On January 15, 2020, Father timely filed his notice of appeal and concise statement of errors complained on appeal.

Father raises the following issue for our review:

> Whether the court erred in finding that [CYS] proved the elements of 23 Pa.C.S.A. § 2511(a)(8) and 23 Pa.C.S.A. [§] 2511(b) through clear and convincing evidence?

(Father's Brief at 4).

Appellate review in termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972 A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.
>
> *In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).
>
> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.
>
> *In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201

(Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. ***In re R.L.T.M.***, 860 A.2d 190, 191[-92] (Pa.Super. 2004).

*In re Z.P., supra* at 1115-16 (quoting *In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

CYS filed a petition for the involuntary termination of Father's parental rights to Child on the following grounds:

**§ 2511.  Grounds for involuntary termination**

**(a)   General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*     \*     \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\*     \*     \*

**(b)   Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which

are first initiated subsequent to the giving of notice of the
filing of the petition.

* * *

23 Pa.C.S.A. § 2511(a)(8), (b). "Parental rights may be involuntarily
terminated where any one subsection of Section 2511(a) is satisfied, along
with consideration of the subsection 2511(b) provisions." ***In re Z.P., supra***
at 1117.[2]  When conducting a termination analysis:

> Initially, the focus is on the conduct of the parent. The party
> seeking termination must prove by clear and convincing
> evidence that the parent's conduct satisfies the statutory
> grounds for termination delineated in Section 2511(a). Only
> if the court determines that the parent's conduct warrants
> termination of his… parental rights does the court engage in
> the second part of the analysis pursuant to Section 2511(b):
> determination of the needs and welfare of the child under
> the standard of best interests of the child.

***In re L.M.***, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

In his sole issue on appeal, Father submits the court failed to properly
consider his progress towards remedying the conditions that led to the
termination of his parental rights. Specifically, Father avers the court wrongly
favored the caseworker's testimony regarding Father's efforts and progress,
rather than Father's own testimony. Father alleges he completed all feasible
requirements of the family service plan. Moreover, Father asserts that the
bond he had formed with Child through their early visitation would have

---

[2] CYS also sought the involuntary termination of Father's parental rights under
Section 2511(a)(1), but we need only analyze Section 2511(a)(8) for purposes
of this appeal.

persisted had CYS not interfered and filed for termination. Father concludes the trial court erred in terminating his parental rights under Section 2511(a)(8) and (b), and this Court must reverse. We disagree.

"[T]o terminate parental rights under Section 2511(a)(8), the following factors must be demonstrated: (1) [t]he child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa.Super. 2003). "Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa.Super. 2003). Once the 12-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts CYS supplied over a realistic time. *Id.* Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of CYS's services. *In re Adoption of T.B.B.*, 835 A.2d 387, 396 (Pa.Super. 2003); *In re Adoption of M.E.P., supra*.

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability

are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond."

*Id.* Significantly:

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.
>
> When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P., supra* at 1121 (internal citations omitted).

"The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and have his... rights terminated." *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa.Super. 2001). This Court has said:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a

genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert [himself] to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his… ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with …her physical and emotional needs.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations omitted). "[A] parent's basic constitutional right to the custody and rearing of his… child is converted, upon the failure to fulfill his… parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *Id.* at 856.

In the instant case, the court evaluated Father's Section 2511(a)(8) claim as follows:

(1) TIME PERIOD OF REMOVAL OF CHILD

It is undisputed that [Child] has been removed from the custody of…Father since May 14, 2018. Accordingly, this removal has persisted well in excess of the statutorily required twelve (12) months since the date of [Child's] placement. Thus, the requisite minimum of at least 12

months from removal of minor [Child] from Father has elapsed so as to comply with this section of 2511(8).

(2)  CONDITIONS CONTINUING TO EXIST

It is clear from the testimony of witnesses and evidence presented that Father has been unable to resolve his substance abuse, concerns with parenting skills, and his mental health issues.

Ms. Stelmak testified that…[Child] was born [in] May [] 2018 and the date of placement for [Child] was May 14, 2018.  According to Ms. Stelmak, the reason for placement was that Mother tested positive for cocaine and marijuana at the time of [Child's] birth.  [Child], at the time of her birth, also tested positive for cocaine.  Ms. Stelmak indicated that on three separate occasions, the agency attempted to reach out to Father in order to assess his residence; however, Father refused access to the agency on all these occasions.  Ms. Stelmak indicated that [Child's] sibling was deemed dependent and was in the custody of [CYS].  She stated that Father was not compliant with court ordered services for substance abuse, parenting, or mental health treatment.

Ms. Stelmak testified that Father was ordered to comply with a family service plan which required a drug and alcohol evaluation, toxicology screens, maintenance of safe and stable housing, completion of a parenting education course, submission to a mental health assessment, and following all recommended services.  Ms. Stelmak testified that the court entered an Order on January 7, 2019 finding aggravated circumstances in the dependency case.  As a result, [CYS was] relieved of efforts to reunify [Child] with [her] parents.  Ms. Stelmak explained that aggravated circumstances were found due to an involuntary termination of parental rights with respect to another child of the natural parents.  …

Ms. Stelmak testified that prior to the finding of aggravated circumstances, Father did not complete any of the required services in the family service plan in order to reunify with his daughter.

Ms. Stelmak testified that she received a call from Father in

mid-April of 2019 regarding the services. Ms. Stelmak stated that even though reasonable efforts to reunify were not required to be made of [CYS], she still provided Father with the names and telephone numbers of service providers such as parenting services, substance abuse services, and mental health services. Ms. Stelmak indicated that…Father did not provide [CYS] with any documentation verifying that he completed the court ordered services prior to the date of filing of the petition to terminate his parental rights on May 14, 2019.

Ms. Stelmak indicated that she spoke with a service provider from Wyoming Valley Alcohol and Drug Services who indicated that Father did not complete any programs. It was recommended that [F]ather participate in individual outpatient therapy and weekly individual sessions. Father participated in three of those sessions and then stopped attending the sessions. Ms. Stelmak testified that the last contact that Father had with Wyoming Valley Alcohol and Drug Services was on May 24, 2018. Ms. Stelmak also testified that on November 25, 2018[,] Father was "closed out" from the Family Service Association due to Father's noncompliance.

With respect to mental health, Ms. Stelmak received a report from Northeast Counseling Center regarding Father which stated that in May 2019 he participated in an evaluation which revealed that Father had a diagnosis of moderate cannabis use disorder. Ms. Stelmak stated that Father did not believe that he had any addiction to cannabis. Ms. Stelmak stated that since Father was taking medication for his seizure disorder, he was advised not to use his medication and to refrain from consuming any alcohol or any type of non-prescribed drug. Father was advised to consult with a physician and was given a lab order requesting a toxicology screen. One week later, Father no longer wanted to engage in services and since there was no referral from [CYS], Father was discharged.

Ms. Stelmak testified that she did not believe…Father remedied the circumstances which led to [Child's] placement. She stated that Father did not provide any proof verifying that he completed the services required of him.

- 11 -

Ms. Stelmak testified that since the date of placement, Father was afforded visitation with [Child]. Ms. Stelmak stated that Father was visiting with [Child] until November 2, 2018. Father visited with [Child] at a facility known as "Vision Quest." Father was then closed out on November 7, 2018 due to his lack of participation in the visits. [CYS] sent a letter to Father advising him to take part in visits on Tuesdays and Thursdays from 9:00 a.m. to 12:00 p.m. at the [CYS] visitation center. Ms. Stelmak stated she had texted Father several times; however, the messages came back as non-deliverable. Ms. Stelmak indicated that Father only provided her with one phone number. On cross examination, Ms. Stelmak stated that Father's visits at Vision Quest were terminated due to his lack of attendance. Ms. Stelmak testified that she sent the aforesaid letter pertaining to the visits changing to [CYS] to the address provided by Father. Ms. Stelmak stated that if Father had moved from his address, it was his responsibility to notify [CYS] within twenty-four (24) hours of any changes to his address or phone number. Ms. Stelmak had learned that Father moved from his address; however, Father never notified Ms. Stelmak of his change of address or phone number. Ms. Stelmak stated that throughout the placement of [Child], Father did not keep consistent contact with Ms. Stelmak in order to inquire about his daughter.

Ms. Stelmak testified that on December 4, 2018, she received a text message from Father stating that he was not able to visit with his daughter at [CYS] because he was working in New York. Ms. Stelmak testified that Father must have received the letter from [CYS] in November 2018 which notified him that the visits would be taking place at [CYS] on Tuesdays and Thursdays.

Father testified that he tried to contact M[s]. Stelmak and left her several text messages. He stated that he went to the [CYS] office a few times and brought gifts with him for [Child]. Father stated that he moved out of his home in September 2018 and that he did notify Ms. Stelmak over the phone of his new address. Father further testified that he was never notified by Ms. Stelmak by text message or telephone call that his visits at Vision Quest were terminated. He also stated that he was never notified of same by Vision Quest.

Father did admit that after his last visit on November 2, 2018, he contacted Ms. Stelmak to advise her that he took a job in New York and that he would be working there for "a while." Father wanted to set up a different visitation schedule upon his return. Father stated that he remained in New York until April 2019 when his job was completed. Father stated that he did have a telephone conversation with Ms. Stelmak in which she advised him that visits would occur on Tuesdays and Thursdays. However, Father was not able to attend these visits due to his employment in New York.

This [c]ourt finds Father's testimony to be inconsistent. Father originally testified that Ms. Stelmak did not provide him with any names of treatment centers and told him he must do it on his own. Then Father changed his testimony and admitted that Ms. Stelmak provided names of certain treatment providers that he could contact. The [c]ourt finds that although Ms. Stelmak told Father that she was not permitted to refer him to a treatment center, she recommended the names and phone numbers of certain treatment providers for Father. The [c]ourt finds Father's testimony to not only be inconsistent, but also not credible and finds Ms. Stelmak's testimony to be credible.

The [c]ourt finds that the conditions that led to [Child's] removal from Father's care and into placement were Father's inability to complete his parenting courses, substance abuse treatment and mental health treatment. The [c]ourt has performed the above extensive analysis in taking testimony and finding credible evidence in concluding that Father did not complete his court ordered services. Therefore, the conditions that gave rise to placement continue to exist.

(3) NEEDS AND WELFARE OF THE CHILD

* * *

[CYS] presented credible testimony regarding the needs, welfare and best interest of [Child] in relation to her Father. Ms. Stelmak testified that [Child] has been in placement with the foster parents since May 2018. Ms. Stelmak testified that the foster parents also adopted another child

- 13 -

and there is another foster child with them in the home, in addition to [Child]. She testified that [Child] has assimilated into the family. According to Ms. Stelmak, she visited the foster home on a monthly basis. She testified that [Child] has a bond with her foster siblings and her foster parents. Ms. Stelmak stated that [Child] enjoys hearing music in the house and there are also many toys in the house for [Child] to play with.

Ms. Stelmak stated that the foster parents meet [Child's] physical needs. They provide her with shelter, clothing, and food. They also take [Child] to her doctor's appointments. In addition, the foster parents meet [Child's] developmental needs. Ms. Stelmak stated that the foster mother homeschools her oldest daughter and includes [Child] in some of the activities at home. The foster parents also meet [Child's] emotional needs. They provide her with comfort when she's sad. They laugh with her when she's happy, and celebrate birthdays with her, in addition to holidays and family events.

Ms. Stelmak describes the relationship between the foster parents and [Child] as a parent/child relationship. [Child] has been residing with the foster parents for one year. Ms. Stelmak testified that she had the opportunity to observe some interaction between [Child] and…Father. Ms. Stelmak testified that Father had not visited with [Child] since November 2018 when [Child] was six months old. As of the date of the hearing, [Child] was 16 months old.

Ms. Stelmak testified that the foster parents wish to adopt [Child]. The foster parents understand that in the event they do adopt [Child], [Child] will have all the rights of a biological child and could inherit from their estate. Ms. Stelmak testified that the foster parents do not have any reservations in their adoption of [Child].

Ms. Stelmak also testified that she did not believe that [Child] would suffer any detrimental impact or effect in the event the [c]ourt terminates…Father's parental rights. Ms. Stelmak believes that adoption of [Child] by the foster parents would be in [Child's] best interest.

(Trial Court Opinion, filed February 14, 2020, at 5-13) (internal citations and

footnotes omitted). Following a comprehensive review of the record, in light of the applicable law, we accept the court's conclusions. Child has been removed from Father for a period in excess of twelve months, and Father has failed to comply with the court-ordered services. Additionally, remaining with Child's foster parents is in Child's best interest. Accordingly, we agree that termination was appropriate pursuant to 23 Pa.C.S.A. § 2511(a)(8).

Similarly, the record supports the court's Section 2511(b) conclusions as well. The notes of testimony reveal Father's lack of affirmative efforts to participate in Child's life. *See In re B., N.M., supra* at 855 (requiring parents to demonstrate "genuine effort to maintain communication and association with the child"). Father has not visited Child since November 2, 2018. (*See* N.T. Termination Hearing, 8/22/19, at 21). Although Father explained his lack of visitation as a consequence of working out of state, he made no effort to remain otherwise active in Child's life by providing financial support, sending gifts, or even inquiring about Child's wellbeing during his absence. (*Id.* at 22-23). As a result, Ms. Stelmak concluded Child "doesn't really have a relationship or bond with [Father] at this time." (*Id.* at 23).

In contrast, Ms. Stelmak testified that the foster parents have met, and continue to meet, Child's physical, developmental, and emotional needs. (*See* N.T. Termination Hearing, 9/10/19, at 14-16). Ms. Stelmak stated that Child has bonded with her foster parents and foster siblings, and has fully assimilated into her foster family. (*Id.* at 13-14). Consequently, Ms. Stelmak

testified that Child would not suffer any detrimental effects upon termination of Father's parental rights. (**Id.** at 16-17). As the record supports the court's conclusions under Sections 2511(a)(8) and (b), we see no reason to disturb its decision to terminate Father's parental rights. ***See In re Adoption of K.J., supra***. For the foregoing reasons, we affirm the decree terminating Father's parental rights to Child.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 07/01/2020